[Cite as *Morris v. Ohio Dept. of Transp.*, 2022-Ohio-1594.]

| | |
|---|---|
| MARTHA MORRIS | Case No. 2018-00991JD |
| Plaintiff | Magistrate Holly True Shaver |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF TRANSPORTATION | |
| Defendant | |

{¶1} Plaintiff brought this action alleging negligence. The issues of liability and damages were bifurcated, and the case proceeded to trial on the issue of liability. The matter has been fully briefed. Defendant's August 17, 2021 motion to strike plaintiff's post-trial briefs for failure to comply with the page limitation in L.C.C.R. 4(E) is DENIED. Plaintiff's August 18, 2021 motion to exceed the page limitation is GRANTED, instanter.

## I.  Factual Background

{¶2} On July 10, 2016, plaintiff, Martha Morris, and her companion, Paul Tracy Fortner, were riding their motorcycles northbound on Cumberland Road south of the intersection of Cumberland Road and Camay Road in Carroll County, Ohio. Cumberland Road, also known as SR 212, is a two-lane, rural highway. The posted speed limit is 55 miles per hour (mph). Camay Road intersects Cumberland Road from the east. A stop sign controls the traffic on Camay Road entering Cumberland Road. On the west side of Cumberland Road, across from Camay Road is an area that can be described as either an expanded shoulder or a "pull-off." Cumberland Road has white, solid edge lines on both the east and west sides of the roadway. The east edge line is interrupted where Camay Road intersects Cumberland Road. The west edge line continues on Cumberland Road adjacent to the pull-off.

{¶3} During their motorcycle ride, another motorist was ahead of both Fortner and plaintiff, driving a 1985 Dodge Ram truck at a slow rate of speed. Fortner and plaintiff

followed the truck, which they estimated was traveling approximately 30-35 mph, when the center line of Cumberland Road was striped with a double yellow line. However, when the pavement marking changed to a dashed yellow line for northbound traffic, Fortner, who was traveling ahead of plaintiff, drove left of the center line and successfully passed the truck. Shortly after Fortner passed the truck, plaintiff attempted to pass the truck by traveling left of the dashed center line. However, when plaintiff attempted to pass the truck, the driver of the truck suddenly turned left to access the pull-off. At that time, plaintiff was unable to avoid the truck, and her motorcycle struck the driver's side door of the truck. The impact with the truck caused plaintiff to be ejected from her motorcycle. Plaintiff landed on the hood of the truck and was dragged underneath the truck, sustaining serious injuries.

{¶4} The pavement markings where plaintiff initiated her passing maneuver included a dashed yellow center line for northbound traffic, and a solid yellow center line for southbound traffic. Although the area of impact was located within 100 feet of the intersection of Camay and Cumberland Roads, a single, dashed yellow center line continued through the intersection, while the solid yellow line for southbound traffic did not continue through the intersection.

{¶5} Plaintiff alleges that defendant, Ohio Department of Transportation (ODOT), was negligent in both its maintenance of the roadway and the signage and striping that was in place at the time of the accident. Plaintiff argues that defendant breached its duty of ordinary care when it striped the intersection with a dashed yellow center line to permit passing when passing is prohibited by statute within 100 feet of an intersection; that the white edge line on the west side of Cumberland Road should not have continued through the intersection; that the length of the passing zone violated mandatory requirements as set forth in the Ohio Manual of Uniform Traffic Control Devices (OMUTCD or Manual[1]);

---

[1] All references throughout this decision shall be to the 2012 Ohio Manual of Uniform Traffic Control Devices.

and, that there was a lack of both visual cues and signage to warn motorists of an intersection. Plaintiff contends that defendant's negligence was a proximate cause of the collision because plaintiff would not have initiated a passing maneuver if she had been alerted that she was approaching an intersection.

## II. Summary of Testimony

{¶6} Paul Tracy Fortner testified that plaintiff was his "common law wife," in that they had been together for 13 years. Fortner stated that he and plaintiff were enjoying a mid-day bike ride, exploring potential places to relocate his recreational vehicle to be closer to his worksite. He described the ride as leisurely, and stated that the collision occurred on a Sunday afternoon around 3:00 p.m.

{¶7} According to Fortner, an old truck was in front of them, traveling approximately 30 mph in a 55-mph zone. Fortner and plaintiff followed the truck for a while because they were not in a passing zone. Fortner stated that the double center line changed to a broken line for his lane of traffic to pass. Fortner checked for traffic behind him, to be aware of his surroundings. Before he passed, he looked in his rearview mirror and then in front of him. No traffic was coming, and Fortner had a "long stretch of clarity." Fortner activated his turn signal, passed the truck, and returned to the right lane. Fortner testified that when he passed the truck, he noticed that the driver's side mirror had no mirror in it. Once Fortner returned to his lane of travel, plaintiff was still behind the truck. According to Fortner, he saw plaintiff signal to pass, and suddenly, he saw the truck driver make a left turn in front of plaintiff, and she was catapulted into the air, landed on top of the hood of the truck, slid underneath the truck, and the truck slid on top of her. Fortner stated that he did not see the truck activate a turn signal.

{¶8} On cross-examination, Fortner explained that he has known plaintiff since 2008, and it was his understanding that once you live with someone for three years, you are considered a common law spouse. Fortner described the weather as a beautiful day for a bike ride: pavement was dry; weather was nice and warm with clear skies. Fortner

did not have a map or a GPS system with him, and he and plaintiff did not have a communication system between them on their motorcycles. Fortner described the ride as having a low volume of traffic. Fortner stated that the truck was driving slowly, that it was in poor shape, and that it was "smoking." Fortner stated that they had been following the truck for a fair distance, and that he did not know whether the driver was having difficulty, but he wanted to pass the truck as soon as he could to avoid it. Fortner passed the truck before they reached the Camay Road intersection. Fortner did not honk his horn before passing the truck. Fortner did not know whether the truck's turn signal was operational. Neither Fortner nor plaintiff were wearing helmets.

{¶9} Plaintiff, Martha Morris, testified that she had been riding motorcycles for two and a half years before the accident. She described herself as being very cautious and aware of her surroundings. Plaintiff stated that she did not have a motorcycle endorsement on her Ohio driver's license, but she had her permit book and was intending on getting the endorsement.

{¶10} Plaintiff described the accident as follows. When Fortner activated his turn signal to pass the truck, she activated hers. She looked to see if it was clear, and she began to pass the truck. Plaintiff never saw whether the truck had its turn signal on, and she did not observe any break lights from the truck. When she was almost parallel with the driver's door of the truck, the truck suddenly turned left. Plaintiff stood up on her "pegs," "laid on the horn," and that is all she remembers. Plaintiff was adamant that the truck driver did not activate his turn signal. Plaintiff testified that in the area where the accident occurred, there was a broken yellow line for her lane of travel, and a solid white edge line on the west side of Cumberland Road. No signs were posted warning of the intersection ahead or stating that it was a no-passing zone. Plaintiff believed she was in a legal passing zone because of the broken yellow line and the solid edge line on the west side of the road, although she did see the pull-off. Plaintiff explained that she feels

she did nothing wrong because she was in a legal passing zone, and she did not see the truck use a turn signal.

{¶11} On cross-examination, plaintiff testified that she was in the process of obtaining a motorcycle endorsement but that she rode that day without one; that she was not aware of the intersection; that she did not honk her horn until she realized the truck was turning in front of her; and that the truck was dilapidated and there was smoke coming from its exhaust pipe. On re-direct, plaintiff testified that she had never been on that roadway before, and she would not have attempted to pass the truck if the road had not been striped as a passing zone. On re-cross, plaintiff stated that in her opinion, the driver of the truck was at fault for not having break lights or a turn signal activated. Plaintiff stated that she would not have attempted to pass the truck if the driver had activated his turn signal. Plaintiff also stated that she relied on the pavement markings when she decided to pass the truck.

{¶12} Jeffrey Solomon testified that he was the deputy sheriff who investigated the accident. Solomon completed the accident report (Defendant's Ex. A) and took photos and witness statements. Solomon spoke to the driver and passenger of the truck and asked them to fill out statements. When Solomon observed the truck, he testified that the turn signal was on. Solomon testified that a photo taken at the accident scene shows the turn signal was illuminated. (Defendant's Ex. D-1.) Solomon testified that he did not issue a citation to plaintiff because she was life-flighted to the hospital. Solomon stated that he could have cited plaintiff for not having a motorcycle endorsement, violation of assured clear distance, or failure to control. However, he also stated that he doubted he would have cited her for improper passing because she was in a passing zone. Solomon stated that it is illegal to pass within 100 feet of an intersection.

{¶13} On cross-examination, Solomon stated that he does not know when the truck driver activated his turn signal, and that it could have been activated after the accident. Solomon stated that he has no evidence to refute plaintiff's testimony that the truck made

an abrupt left turn. Solomon stated that he does not have proof of either side's story; he just observed skid marks and debris from the crash. Solomon testified that the state had striped the area as a passing zone, and that the state also prohibits passing in an intersection. He added that whether the state striped it wrong or not, there is a revised code section prohibiting passing within 100 feet of an intersection. Solomon stated that plaintiff was not approved to operate a motorcycle because she lacked an endorsement on her driver's license. He described the area on the west side of Cumberland Road as a gravel pull-off. He testified that it was not a driveway, and that gravel pull-offs are located all around Carroll County.

### III. Summary of Expert Testimony

{¶14} The magistrate notes that both sides presented expert testimony. However, the circumstances in this case were a little unusual. Between the time of the court's decision on summary judgment and trial, plaintiff's expert, Patrick Altvater, retired. At trial, plaintiff presented the expert testimony of Gordon Meth, P.E., who was employed by the same firm as Altvater. Meth testified that he had access to Altvater's materials and used them when drafting his expert report in this case. Defendant's expert witness, Keith Bergman, relied on the deposition testimony of defendant's former expert witness, Duane Soisson, P.E., an employee of ODOT, to reach his opinions in this matter. The depositions of both Soisson and Altvater were previously filed in this matter. Both Altvater and Soisson conducted site visits of the roadway. However, neither Meth nor Bergman conducted a site visit themselves.

{¶15} Plaintiff's expert, Gordon Meth, P.E., has a master's degree in civil engineering and has worked in the field of traffic engineering for almost 30 years. Meth is licensed in many states, including Ohio. Meth reviewed Altvater's investigative reports and rebuttal reports, the deposition testimony of Soisson, and affidavits from Altvater, plaintiffs, and Solomon. Meth concurred with Altvater's opinions in this matter and offered

additional opinions as well, which are included in his expert report. (Plaintiff's Ex. 13.) Meth stated that the 2012 version of the OMUTCD is the one in effect in this case.

{¶16} Meth testified that ODOT District 11 hired a company called MasterMind Systems, Inc., to review the roads, including Cumberland Road, and determine where no-passing zones should be marked.  Meth testified that MasterMind created logs of start and end mile markers to the nearest thousandth of a mile of locations where there was insufficient visibility to oncoming traffic.  Meth stated that MasterMind placed solid yellow pavement markings to designate the no-passing zones because of a lack of adequate passing sight distance.  Meth stated that the determination of no-passing zones does not necessarily mean that all other areas are appropriate for passing.  Meth stated that engineering judgment must be used to determine an appropriate passing zone.

### A. Dashed Center Line

{¶17} Meth reviewed the plans for ODOT Project CAR 212 0.00, Project ID 85107, dated October 5, 2012 (project).  Meth testified that the project, which he described as an asphalt overlay project, was constructed in 2013.  According to Meth, the striping was supposed to be placed as it had been prior to the project, but afterwards, there were changes to the passing zone.  Specifically, before the project, no center line appeared on Cumberland Road where Camay Road intersected it.  However, after the project, a broken yellow center line was striped through the intersection.  Meth testified that Plaintiff's Exhibits 2 and 3 depict the striping in the intersection prior to and after the project.  In Plaintiff's Exhibit 2, a Google street view photo of the area taken in October 2012, no center line appears on Cumberland Road at the intersection with Camay Road. In Plaintiff's Exhibit 3, another Google street view from October 2015, a broken yellow center line continues through the intersection.  In both photos, a solid white edge line is present on the west side of Cumberland Road.

{¶18} Meth referred to the broken yellow center line as a dashed yellow or "skip" line.  Meth criticized the skip lines through the intersection and stated that they violated

the Manual. Meth testified that Figure 3B-13 D—"Typical dotted line markings to extend center line and lane line markings into the intersection," has the following note: "Lane line extensions in the intersection may be dotted or solid white lines. Center line extensions in the intersection *shall* be dotted yellow lines." (Emphasis added.) (Plaintiff's Ex. 7; Manual, p. 419.) Meth stated that the language in the note is mandatory, and it supports his contention that it is not permissible to stripe center lines through intersections. Meth stated that a skip line through the intersection is a signal to the traveling public that passing is permitted in that area, even though R.C. 4511.30 prohibits passing within 100 feet of an intersection. Meth stated that it is reasonable for the traveling public to rely on center line markings to know whether it is permissible to pass. Meth also referred to a construction plan drawing of an intersection with a similar design to the one at issue in this case. (Plaintiff's Ex. 8.) Meth testified that this drawing shows that no center lines are depicted through the intersection. Meth stated that this drawing is evidence that center lines are typically not striped through intersections, just as the photos of the intersection prior to the project show.

**B. Intersection Definition and Edge Line Criticism**

{¶19} Meth cited Manual, Section 1A.13(98) for the definition of "intersection." The Manual states, in relevant part:

"Intersection – 'means:

(1) The area embraced within the prolongation or connection of the lateral curb lines, or, if none, the lateral boundary lines of the roadways of two highways that join one another at, or approximately at, right angles, or the area within which vehicles traveling upon different highways that join at any other angle might come into conflict. The junction of an alley or driveway with a roadway or highway does not constitute an intersection unless the roadway or highway at the junction is controlled by a traffic control device.'"

{¶20} Meth stated that Plaintiff's Ex. 6 depicts his opinion on what the intersection encompassed.  Meth included part of the pull-off in his depiction of the intersection.  Meth testified that the pull-off was not a driveway, so the second sentence in the Manual's definition of intersection does not apply.

{¶21} Meth also criticized the white edge line on the west side of Cumberland Road.  Meth cited Manual Section 3B.08, paragraph 6, which states, in part: "Standard: Solid lines shall not be used to extend edge lines into or through intersections or major driveways."  (Manual, p. 417.)  Meth opined that the white edge line on the west side of Cumberland Road extended through the intersection, and, as such, violated a mandatory provision of the Manual.  On cross-examination, Meth conceded that nothing prevents a motorist from crossing a white edge line, and that crossing a white edge line is not a violation of any traffic control device.

### C.  Length of Passing Zone

{¶22} The other change in pavement markings after the project was that the passing zone for northbound traffic was extended an additional 80 feet to the south on Cumberland Road. The difference in the passing zone before and after the project is shown in Figures 4 and 5 of Meth's report.  (Plaintiff's Ex. 13, p. 6; *See also*, Plaintiff's Ex. 4, 5.)  Meth testified that the length of the passing zone before the project was 685 feet, but after the project, it was 765 feet.  Meth referred to Plaintiff's Ex. 9 to show his calculations of the measurements of the passing zones in advance of the intersection. Meth stated that a passing zone must be a minimum of 900 feet in length for a roadway with a 55-mph speed limit.  (Table 3B-1. Minimum Passing Sight Distances for No-Passing Zone Markings, Manual, p. 396.)  Meth opined that the passing zone at the time of the accident was 765 feet, which did not meet the requirements of the Manual.

### D.  Intersection Warning Signs

{¶23} Meth reviewed the ODOT Pathweb video logs of the area that were taken on August 9, 2016, a month after the accident, to determine how far in advance of the

intersection a reasonable motorist would detect the presence of the intersection. Meth also relied on Altvater's report to conclude that the intersection was not detectable by northbound motorists until a motorist was approximately 200 feet in advance of the intersection. Meth stated that looking at the Pathweb videos, a triangular sign, vegetation, and a telephone pole along the right side of Cumberland Road obscure a motorist's view of the stop sign on Camay Road, which would signal an intersection ahead. Meth also stated that Camay Road intersects Cumberland Road from a lower elevation, which would make it difficult to detect from a distance. Meth referred to the photograph in Plaintiff's Ex. 10 to show the lower elevation of Camay Road. Meth stated that based upon the Pathweb videos, there are not enough visual cues for a motorist to detect the presence of an intersection until the motorist is 200 feet away from Camay Road. Meth further testified that a motorist needs 495 feet to stop if another motorist suddenly appears in an intersection, and since the intersection was not detectable prior to 200 feet, there was not sufficient stopping sight distance in advance of the intersection. Meth opined that signage, either warning of an intersection ahead, or a sign that stated "no-passing" was warranted.

{¶24} Meth conceded that intersection warning signs were not mandatory pursuant to the Manual. However, Meth testified that in this instance, an intersection warning sign was warranted because advance visibility of the intersection was not present. Meth stated that an intersection ahead warning sign, or a no-passing warning sign was justified and would have prevented the accident. Meth did not dispute that plaintiff violated R.C. 4511.30 by passing in an intersection. Meth stated that the accident history in this area is not relevant because it is such a low volume roadway.

{¶25} Defendant's Expert, Keith Bergman, is a licensed civil engineer in 13 states, including Ohio. Bergman wrote a report with his opinions in this case. (Defendant's Ex. E.) Bergman testified that Plaintiff's Ex. 8, the sketch of a T-intersection[2] of

---

[2] Although at trial, reference was made to a T-intersection, the Manual would describe this as a "side-road intersection," with a more accurate depiction shown in intersection warning signs W2-2 or W2-

Cumberland and Amsterdam Roads was not similar to the intersection at issue because of the traffic loads. Bergman testified that Amsterdam Road is a state highway and a major collector. Bergman stated that the traffic volume for the roadway shown in Plaintiff's Ex. 8 was four times the traffic volume for the intersection in this case. Bergman stated that the striping as depicted in Plaintiff's Ex. 8 is not what was required at the intersection. Bergman cited Section 3B.08 of the Manual, which requires that "pavement markings extended into or continued through an intersection or interchange area shall be the same color and at least the same width as the line markings they extend." (Manual, p. 417.) Bergman noted that the skip lines through the intersection complied with Section 3B.08 of the Manual. Bergman testified that nothing in the Manual prohibits skip lines through an intersection. Bergman also testified that the examples of line extensions through intersections found in Plaintiff's Ex. 7 do not apply to this intersection. (Manual, p. 418-419.) Specifically, Bergman stated that the examples in Plaintiff's Exhibit 7 are for turning movements in multi-lane roadways, a configuration which was not present at the location of this accident. Therefore, Bergman opined that the mandatory language in the note on Figure 3B-13, Example D, which states that center line extensions in the intersection shall be dotted yellow lines does not apply in this instance.

{¶26} Bergman testified that the area in question was a 3-way or a T-intersection, not a 4-legged intersection. Bergman opined that the continuous white edge line on the west side of Cumberland Road met the standard of care and was appropriately placed. Bergman relied on the language in the Manual that defines intersections and describes edge lines and their purpose. (*See*, Manual, Section 1A.13, 98(1), p. 17; Section 3B.06, p. 416.) Bergman testified that the edge line on the east side of Cumberland Road, where Camay Road intersects it, stops appropriately at the intersection because Camay Road intersects Cumberland Road in that area. However, Bergman stated that the pull-off on

---

3, as opposed to the T-intersection depicted in W2-4. (See, Manual, Section 2C.46, Intersection Warning Signs, p. 146-147.)

the west side of Cumberland Road is not a road, and, at best, is a minimum use driveway with minimal traffic flow. According to the Manual, the junction of an alley or driveway with a roadway or highway does not constitute an intersection unless the roadway or highway at the junction is controlled by a traffic control device. (Manual, Section 1A.13, 98(1), p. 17.) Since there is no road or major driveway on the west side of Cumberland Road, and the junction of the pull-off and Cumberland Road is not controlled by a traffic control device, Bergman stated that the pull-off adjacent to Cumberland Road is not included in the definition of an intersection. Thus, the west edge line does not extend into or through the intersection, and the pull-off is not a major driveway, so there is no violation of Section 3B.08 of the Manual. Bergman disagreed with Meth's depiction of the intersection including a portion of the pull-off as shown in Plaintiff's Ex. 6.

{¶27} Bergman explained that he viewed a report from MasterMind Systems, ODOT's Pathweb physical features video log, and Google Street View and Google Earth images. Bergman stated that in an area with a 55-mph speed limit, 900 feet of passing sight distance is required. (See, Table 3B-1. Minimum Passing Sight Distances for No-Passing Zone Markings, Manual, p. 396.) In contrast to Meth's calculations as shown in Plaintiff's Ex. 9, Bergman testified that the total length of the passing zone for northbound traffic was approximately 1200 feet, comprising of 900 feet south of Camay Road, as well as 300 feet north of Camay Road. On cross-examination, Bergman conceded that the 1200-foot length of the passing zone included the area surrounding the intersection, even though it is prohibited by statute to pass within 100 feet of an intersection. Bergman stated that there is no requirement in the Manual that intersections be marked as no-passing zones. (See Section 3B.02, paragraph 5, Manual, p. 398, "There is explicitly no requirement under this Manual that no-passing zones shall be marked at intersections, notwithstanding the provisions of any other section of this Manual.")

{¶28} Bergman explained that passing sight distance is different from the minimum length of a passing zone. Bergman stated that passing sight distance is the distance

ahead of a motorist that must be clear so that a motorist can make a passing maneuver. Bergman agreed that the passing sight distance for a 55-mph zone is 900 feet, and that there was adequate passing sight distance on Cumberland Road. Bergman testified that passing with care was permitted for approximately 900 feet in advance of the intersection, and that the northbound passing zone met the sight distance requirements of the Manual. According to Bergman, the minimum length of a passing zone for an area with a speed limit of 50 mph or more is 600 feet. Bergman cited Manual section 3B.02, paragraph 10 for this requirement.[3] Bergman testified that the language he relied on must be supplemented by the errata sheet for the Manual due to a typographical error. According to Bergman, the Manual states that no-passing zones should not be less than 500 feet, and that the distance between successive no-passing zones should be no less than 600 feet. Bergman opined the 765 foot long passing zone as shown in Meth's calculations complied with the 600-foot minimum requirement as set forth in the Manual.

**{¶29}** Bergman testified that there was no requirement in the Manual to place advance warning signs, such as "intersection ahead," in this location. Bergman noted that the language in the Manual about advance warning signs is permissive, not mandatory. Finally, Bergman opined that the driving actions of plaintiff were the

---

[3] Section 3B.02 of the Manual, paragraphs 9-10, under "Guidance" states: "The decision as to whether or not a no-passing zone should be marked at intersections is a matter of engineering judgment. When used, the no-passing zone should start at least 100 feet in advance of the intersection.

The no-passing zone marking should not be less than 500 feet in length, except in advance of an intersection, or as a result of a special engineering study. If the actual no-passing zone distance is less than 500 feet, an additional length of marking should be added at the beginning of the zone. *The distance between successive no-passing zones should be no more than 400 feet for speeds less than 50 mph and no more than 600 feet for speeds 50 mph or greater.* When the distances are less than these, the single or double no-passing lines should be extended to connect the zones." (Manual, p. 398. Note that as of October 18, 2013, this section appeared in the "Known Errors in the 2012 OMUTCD, updated January 21, 2022", p. 5: "Section 3B.02 (page 398) In Paragraph 10, the third sentence should be revised to: "The distance between successive no-passing zones should be no *less* than 400 feet for speeds less than 50 mph and no *less* than 600 feet for speeds 50 mph or greater.") The court notes that reading the original language in the Manual, italicized above, it is apparent that it was a typographical error to use the word "more" instead of "less," because the sentence directly after that language uses the word "less," and using the word "more" would not make sense.

proximate cause of the accident. Bergman opined that ODOT's actions or omissions were not the proximate cause of the accident.

## IV. Law and Analysis

{¶30} In order for plaintiff to prevail on her claim of negligence, she must prove by a preponderance of the evidence that defendant owed her a duty, that it breached that duty, and that the breach proximately caused her injuries. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285, 423 N.E.2d 467 (1981). Defendant has a general duty to maintain its highways in a reasonably safe condition. *Knickel v. Ohio Dept. of Transp.,* 49 Ohio App.2d 335, 361 N.E.2d 486 (10th Dist.1976). However, defendant is not an insurer of the safety of its highways. *Rhodus v. Ohio Dept. of Transp.*, 67 Ohio App.3d 723, 588 N.E.2d 864 (10th Dist.1990).

{¶31} ODOT may be held liable for damages for accidents that are proximately caused by its failure to conform to the requirements of the OMUTCD. *Pierce v. Ohio Dept. of Transp.*, 23 Ohio App.3d 124, 491 N.E.2d 729 (10th Dist.1985); *see also Lumbermens Mut. Cas. Co. v. Ohio Dept. of Transp.*, 49 Ohio App. 3d 129, 551 N.E.2d 215 (10th Dist.1988). Not all portions of the manual are mandatory, and, therefore, some areas are within the discretion and engineering judgment of ODOT. *Perkins v. Ohio Dept. of Transp.*, 65 Ohio App.3d 487, 495, 584 N.E.2d 794 (10th Dist.1989); *Cunningham v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 08AP-330, 2008-Ohio-6911, ¶ 24. Only the OMUTCD's mandatory requirements, normally using the word "shall," impose a duty on ODOT. Provisions which use the words "should" or "may" are not mandatory. The 2012 edition of the Manual uses the term "Standard" for its mandatory requirements. (See, Manual, Section 1A.13, p.12.) "The issue of whether an act constitutes a mandatory duty or a discretionary act determines the scope of the state's liability because ODOT is immune from liability for damages resulting from not performing a discretionary act." *Gregory v. Ohio Dept. of Transp.,* 107 Ohio App.3d 30, 33-34, 667 N.E.2d 1009 (10th Dist.1995), citing *Winwood v. Dayton,* 37 Ohio St.3d 282, 525 N.E.2d 808 (1988).

{¶**32**} Upon review of the testimony and evidence presented at trial, the magistrate finds that plaintiff has proven that the center line striping and the length of the passing zone on Cumberland Road changed after MasterMind completed the project. Therefore, the question becomes whether any of those changes violated the Manual, and, ultimately, whether any violation of the Manual proximately caused plaintiff's injuries.

### A. Dashed Center Line

{¶**33**} The court finds that the testimony of Bergman was more credible and persuasive than the testimony of Meth regarding whether the skip lines through the intersection violated the Manual. The Manual's requirement, Section 3B.08, titled "Extensions Through Intersections or Interchanges" states: "Standard: Except as provided in Paragraph 2, pavement markings extended into or continued through an intersection or interchange area shall be the same color and at least the same width as the line markings they extend (see Figure 3B-13)." The yellow skip lines are the same color and the same width as the center line south of the intersection. The court finds that plaintiff has failed to prove that the skip lines through the intersection violated this provision of the Manual.

{¶**34**} Plaintiff argues that defendant violated the mandatory language in the note on Figure 3B-13(D), which states that center line extensions in the intersection shall be dotted yellow lines. However, the court finds that the illustration depicts a multi-lane intersection with dotted lines to direct motorists through a curve. That illustration does not accurately depict the intersection at issue in this case. Moreover, the court notes that the illustrations are examples for Manual Section 3B.08, Extensions Through Intersections or Interchanges. The "guidance" language therein states: "Where highway design or reduced visibility conditions make it desirable to provide control or to guide vehicles through an intersection or interchange, such as at offset, skewed, complex, or multi-legged intersections, on curved roadways, where multiple turn lanes are used, or

where offset left turn lanes might cause driver confusion, dotted line extension markings consisting of 2-foot line segments and 2- to 6-foot gaps should be used to extend longitudinal line markings through an intersection or interchange area." The court finds that this language explains the illustration depicted in Figure 3B-13(D). In an area where there are multiple turn lanes, the dotted lane line and center line extensions guide motorists through the turn. In the intersection in this case, plaintiff argues that the skip lines are prohibited, but then argues that the center line, if intended to go through the intersection, should have been a dotted yellow line. The magistrate finds this argument without merit. The title of the Manual Section 3B.08, "Extensions Through Intersections or Interchanges" shows that center lines and lane lines sometimes extend through intersections. Plaintiff's argument that the skip lines through an intersection are prohibited is belied by the language in the Manual. Moreover, Manual Section 3B.08, paragraph 10 discusses the requirements for color and width of center lines that continue through an intersection. This language clearly contemplates that center lines may continue through intersections in certain cases. Plaintiff's argument that the skip lines violate the Manual is not persuasive. Furthermore, the court finds that whether skip lines or a dotted yellow line were present through the intersection, that minor difference would not have been a significant visual cue to alert plaintiff about the presence of the intersection. Finally, the Manual states: "There is explicitly no requirement under this Manual that no-passing zones shall be marked at intersections, notwithstanding the provisions of any other section of this Manual." (Manual, Section 3B.02, paragraph 5, p. 398.) In summary, the magistrate finds that plaintiff has failed to prove, by a preponderance of the evidence, that the presence of skip lines through the intersection violated any applicable mandatory provision of the Manual.

## B. Intersection Definition and Edge Line Criticism

{¶35} Turning to plaintiff's argument about the west edge line, the magistrate finds that the testimony of Bergman was more credible and persuasive than the testimony of

Meth on this issue. The purpose of edge lines is to guide a driver to know where the border of the road is. (Manual Section 1A.13, paragraph 60; Manual Section 3B.06, "Standard: If used, edge line pavement markings shall delineate the right or left edges of a roadway.") The magistrate finds that Meth's depiction of the intersection in this case includes part of the pull-off, in an effort to support plaintiff's argument that the west edge line continued through the intersection. However, upon review of the Manual's definition of the word, "intersection," the magistrate concludes that Meth's inclusion of part of the pull-off is erroneous. The pull-off was not within the area embraced within the prolongation or connection of the lateral boundary lines of the roadways of Cumberland and Camay Roads, nor was it in the area within which vehicles traveling upon either Cumberland or Camay Road might come into conflict. (Manual, Section 1A.13(98)(1).) Camay Road does not continue west of Cumberland Road; thus, there is no other road that intersects on the west side of Cumberland Road. Moreover, the pull-off was not an alley, and both experts agreed it was not a driveway. However, even assuming for purposes of argument that the pull-off were a driveway, minor or major, the pull-off was not controlled by a traffic control device at the junction of the pull-off and Cumberland Road. Therefore, although the magistrate finds that the junction of Camay Road, which was controlled by a stop sign, and Cumberland Road constitutes an intersection by definition, the magistrate further finds that the pull-off is not part of the intersection. Therefore, plaintiff's argument that the edge line on the west side of Cumberland Road violated Manual Section 3B.06 by continuing through the intersection is without merit.

### C. Length of Passing Zone

{¶36} The court notes that Table 3B-1 in Section 3B.02 of the Manual sets forth the minimum passing sight distances for No-Passing Zone markings. In this case, Cumberland Road was marked as 55-mph. In order to stripe the pavement to allow passing, there must be a minimum of 900 feet of passing sight distance. However, the table itself does not state that a passing zone must be at least 900 feet long. The table

describes the minimum passing sight distance for no-passing zone markings. The following language contained in the Standard section of Section 3B.02 is instructive: "On two-way, two- or three-lane roadways where center line markings are installed, no-passing zones shall be established at vertical and horizontal curves and other locations where an engineering study indicates that passing must be prohibited because of inadequate sight distances or other special conditions. * * * There is explicitly no requirement under this Manual that no-passing zones shall be marked at intersections, notwithstanding the provisions of any other section of the Manual." (Manual, p. 396, 398.)

{¶37} Bergman testified that Manual Section 3B.02, paragraph 10, refers to how much space must be between successive no-passing zones. The Manual states, "The distance between successive no-passing zones should be no less than 400 feet for speeds less than 50 mph and no less than 600 feet for speeds 50 mph or greater. When the distances are less than these, the single or double no-passing lines should be extended to connect the zones." (Manual, p. 398, supplemented by Known Errors in the 2012 OMUTCD, as of 10/18/13, p. 5.) Meth's diagram in Plaintiff's Ex. 9 shows that his calculations for the passing zone for northbound traffic on Cumberland Road measured 765 feet, not including 100 feet in advance of the intersection and the intersection itself. The magistrate finds that the Manual's phrasing of "the distance between successive no-passing zones," while not explicitly using the term "passing zone," means the minimum length of a passing zone. The magistrate finds that Bergman's testimony was more credible and persuasive than Meth's on this issue. Based upon Meth's depiction in Plaintiff's Ex. 9, the magistrate finds that defendant did not violate the Manual's 600-foot minimum passing zone requirements by striping a passing zone that measured 765 feet in advance of the intersection. Plaintiff's argument that defendant was required to have a minimum passing zone of 900 feet is not supported by the Manual.

### D. Intersection Warning Signs

{¶38} The language in the Manual that pertains to intersection warning signs is permissive, not mandatory.  Even Meth testified that defendant did not violate any mandatory language in the Manual by not placing intersection warning signs in advance of the intersection.  Although Meth testified that an intersection warning sign was justified, the magistrate finds that the absence of a warning sign was discretionary, and that defendant did not violate any mandatory language in the Manual by not posting an intersection warning sign.

{¶39} Moreover, the magistrate does not find Meth's testimony credible or persuasive that the intersection was not discernable until a motorist was 200 feet south of the intersection.  Although Meth testified that the stop sign on Camay Road was not visible until 200 feet south of the intersection, photographs of the area do not convince the magistrate that the intersection of Camay Road was not discernable until being 200 feet in advance of the intersection.  Meth testified that the stop sign on Camay Road was obscured by foliage, a triangular sign, and a telephone pole.  However, Cumberland Road was a flat, open roadway, and the Google Street View image, taken October 2015, clearly shows Camay Road intersecting from the east side.  (Defendant's Ex. E, p. 11.)

{¶40} In summary, the magistrate finds that plaintiff has failed to prove, by a preponderance of the evidence, that defendant violated any mandatory provision of the Manual.  Therefore, plaintiff has failed to prove that defendant was negligent in this matter.

### E.  Proximate Cause

{¶41} However, even if defendant had acted negligently, the magistrate finds that defendant's negligence was not the proximate cause of plaintiff's injuries.  Defendant is only "liable in damages if proximate causation is established." *Leskovac v. Ohio Dept. of Transportation,* 71 Ohio App.3d 22, at 27-28, 593 N.E.2d 9 (10th Dist.1990).  "While difficult to define, 'proximate cause' is generally established where an original act is wrongful or negligent and, in a natural and continuous sequence, produces a result that would not have taken place without the act. * * * Essentially, a plaintiff must present

evidence upon which a trier of fact may reasonably determine that it is more likely than not that the negligence of a defendant was the direct or proximate cause of the plaintiff's injury. * * * It is also well-settled that because the issue of proximate cause is not open to speculation, conjecture as to whether the breach of duty caused the particular damage is not sufficient as a matter of law. * * * Further, a plaintiff must establish proximate cause by a preponderance of the evidence." (Citations omitted.) *Whiting v. Dept. of Mental Health*, 141 Ohio App.3d 198, 202-203, 740 N.E.2d 644 (10th Dist.2001). "The rule of proximate cause 'requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and, should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act.'" *Zavinski v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 18AP-299, 2019-Ohio-1735, ¶ 29, 135 N.E.3d 1170, quoting *Jeffers v. Olexo*, 43 Ohio St.3d 140, 143, 539 N.E.2d 614 (1989). Further, the common law of Ohio imposes a duty of reasonable care upon motorists, which includes the responsibility to observe the environment in which one is driving. *Hubner v. Sigall*, 47 Ohio App.3d 15, 17, 546 N.E.2d 1337 (10th Dist.1988). The magistrate finds that the proximate cause of the accident and plaintiff's injuries was both drivers' failure to use ordinary care under the circumstances.

{¶42} Initially, the magistrate finds that plaintiff did not use ordinary care when she initiated her passing maneuver. The magistrate finds that plaintiff crossed the center line in a marked passing zone while attempting to pass a slow-moving truck. In addition to the vehicle's slow speed, the magistrate also finds that Fortner's testimony was credible that the truck was in poor condition, that the truck's side mirror was missing, and that the truck was "smoking." Thus, in the magistrate's opinion, the need to proceed cautiously should have been apparent upon reasonable observation. Plaintiff admitted that she was driving her motorcycle without an endorsement on her driver's license, that she did not honk her horn prior to attempting to pass the truck to alert the driver that she was about

to pass (as required by R.C. 4511.27), and that she passed the truck within 100 feet of an intersection (which is prohibited by R.C. 4511.30(A)(3)). Unfortunately, the truck driver turned left in front of plaintiff's path, and she was unable to avoid striking the truck.

{¶43} In addition, considering the evidence, the magistrate finds that it was more likely than not that the driver of the truck also failed to use ordinary care when he attempted to turn. The driver of the truck operated it that day without a driver's side mirror, which would have potentially provided a view of plaintiff before she attempted her pass. Further, though Solomon testified credibly that the truck's turn signal was illuminated when he arrived at the scene, he admitted that he did not witness the accident, so he could not state with certainty whether the turn signal was activated prior to or after the accident. On the other hand, plaintiff and Fortner both testified that the truck did not use its turn signal. Nonetheless, the driver of the truck suddenly turned in front of plaintiff when plaintiff attempted to pass and did so immediately after another motorcycle, driven by Fortner, passed on the same side. The driver failed to look for and/or notice plaintiff and either failed to signal or failed to signal soon enough to allow plaintiff to observe it before she attempted to pass. The driver did so while attempting to turn off of a 55-mph state route, not onto another road, but onto the shoulder of the state route on its opposite side. The evidence firmly establishes the truck driver's lack of ordinary care.

{¶44} The magistrate also finds that the presence of skip lines through the intersection was not a proximate cause of the accident. Even in a passing zone, a motorist is charged with the duty of reasonable care: the presence of a skip line does not mean that a motorist can pass in every circumstance. Moreover, plaintiff testified that she activated her turn signal at the same time as Fortner. Fortner testified that he activated his turn signal at the earliest time that the center line changed to a passing zone. Thus, plaintiff's testimony that she relied on the presence of skip lines in the intersection as a visual cue that she was permitted to pass is not credible or persuasive to the magistrate.

{¶45} Furthermore, even assuming that plaintiff was unable to see the intersection until she was 200 feet in front of it, she would have seen Camay Road at or near the same time that she saw the skip lines through the intersection. Plaintiff's testimony that she relied on the visual cue of the skip lines but not on the visual cue of Camay Road itself is not credible or persuasive. The magistrate also finds that the presence of the west edge line was appropriate. Plaintiff's reliance on the west edge line as a visual cue that there was no intersection on the east side of Cumberland Road was not reasonable, as an edge line's purpose is to allow a motorist to observe the border of a roadway. Even Meth agreed that there was nothing to prohibit the truck driver from crossing an edge line, whether near the intersection or on any other part of Cumberland Road. The magistrate finds that plaintiff has failed to prove that either the presence of skip lines through the intersection or the presence of the edge line on the west side of Cumberland Road was the direct or proximate cause of her injuries.

{¶46} The magistrate is cognizant that plaintiff sustained severe injuries in this case and is not without sympathy for plaintiff. However, in the final analysis, the magistrate finds that defendant was not negligent, and that the negligence of both plaintiff and the truck driver in failing to operate their vehicles in a reasonable manner was the sole proximate cause of plaintiff's injuries. The pavement markings in place on the day of the accident were not. For the foregoing reasons, the magistrate finds that plaintiff has failed to prove any of her claims by a preponderance of the evidence and, accordingly, judgment is recommended in favor of defendant.

{¶47} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or*

*conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

**Filed March 16, 2022**
**Sent to S.C. Reporter 5/12/22**